Theresa M. Petrello

    v.

City of Manchester, et al.

Civil No. 16-cv-008-LM
Opinion No. 2017 DNH 173

# O R D E R

Theresa M. Petrello brings suit against the City of
Manchester, New Hampshire ("City") alleging violations of her
First, Fourth, and Fourteenth Amendment rights as a result
of actions taken by the City while she was panhandling.
Specifically, Petrello challenges the decision of Manchester
Police Officer Ryan J. Brandreth to charge her with disorderly
conduct—even though she solicited donations passively, without
ever stepping into the road.  Petrello also challenges a City
ordinance making it unlawful to distribute items to or receive
items from the occupant of a car located on a public road.  The
court previously granted Officer Brandreth's motion for judgment
on the pleadings on qualified-immunity grounds (doc. no. 26),
leaving the City as the only defendant remaining in the case.
Petrello and the City have filed cross motions for summary
judgment.  On May 9, 2017, the court heard oral argument on the
motions.

**STANDARD OF REVIEW**

A movant is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reviewing the record, the court construes all facts and reasonable inferences in the light most favorable to the nonmovant. Kelley v. Corr. Med. Servs., Inc., 707 F.3d 108, 115 (1st Cir. 2013). On cross motions for summary judgment, the standard of review is applied to each motion separately. See Fadili v. Deutsche Bank Nat'l Tr. Co., 772 F.3d 951, 953 (1st Cir. 2014).

**BACKGROUND**

**I.    Efforts to Curb Panhandling in Manchester**

In recent years, the City and the Manchester Police Department ("MPD") have stepped up their enforcement efforts to curtail panhandling in the City. In January 2015, then Manchester Police Chief David Mara requested a meeting with the City Solicitor's Office to discuss a "new plan of action" related to panhandlers. See doc. no. 28-8 at 3 of 3. That same month, Captain James Soucy of the Community Policing Division issued a report stating that a "growing number of complaints from area businesses and citizens alike generated a push to deal with the ever growing number of Panhandlers in the city." Doc.

no. 28-2 at 3 of 6.  Captain Soucy's report stated that the
Community Policing Division was "tasked with coming up with a
solution to this problem."  Id.  Captain Soucy placed two
officers in charge of communicating with the City Solicitor's
Office so there would be greater "clarity" in terms of the MPD's
approach to panhandling.  Doc. no. 28-1 at 5 of 24.

According to Captain Soucy, he had been studying the issue
of panhandling from the moment he took command of the Community
Policing Division.  See id. at 4 of 24.  He discussed his
initiatives during "regular meetings with the chief [of police],
the assistant chief, command meetings."  Id.  Indeed, according
to Captain Soucy, the issue of how to deal with panhandlers had
been discussed "ad nauseam" by officers at the MPD since Captain
Soucy joined the force in 1992.  Id. at 12 of 24.

In early 2015, Captain Soucy asked Lieutenant Stephen
Reardon, who worked in the MPD's Legal Division, to research
laws that officers could use to combat unlawful conduct
associated with panhandling.  The MPD was concerned with
reducing two types of panhandlers: those who simply held a sign
soliciting a donation (referred to as "passive") and those who
walked into the road or took other action to solicit a donation
(referred to as "aggressive").  See doc. no. 28-3 at 5 of 30;
doc. no. 28-1 at 4 of 24.  Lieutenant Reardon looked at the
state motor vehicle and criminal codes to determine the most

appropriate statutes to address panhandlers "entering the roadway, stopping traffic, obstructing traffic, doing things of that nature."  Doc. no. 28-3 at 7 of 30.  And, he consulted the City Solicitor's Office as part of his research.

Lieutenant Reardon trained his focus on the Disorderly Conduct statute, RSA 644:2, which, in relevant part, prohibits conduct that "[o]bstructs vehicular or pedestrian traffic on any public street or sidewalk . . . ."  RSA 644:2, II(c).  As a result of Lieutenant Reardon's research, the MPD sent two emails to MPD officers, one on February 5 and the other on July 2, 2015, advising officers to use RSA 644:2, II(c) as a charging option against panhandlers.  Captain Soucy stated that the MPD wanted "to make an arrest that had some teeth to it."  Doc. no. 28-1 at 9 of 24.

The first email, sent on February 5, 2015, by Lieutenant Reardon stated:

> In an effort to address the numerous issues resulting from those who use the roadways for unlawful purposes—to include ***Panhandling***—please consider utilizing the DOC as your first charging option outlined below.
>
> ***644:2 Disorderly Conduct.*** *— A person is guilty of disorderly conduct if:*
>    *I. He knowingly or purposely creates a condition which is hazardous to himself or another in a public place by any action which serves no legitimate purpose; or*
>    *II. He or she:*
>      ***(c) Obstructs vehicular or pedestrian traffic on any public street or sidewalk*** *or the entrance to any public building . . . .*

Doc. no. 28-6 at 2 of 3 (emphases in original) (hereinafter, "February 5 email"). According to Lieutenant Reardon, his job description included issuing "policy directives" to the MPD officers. Doc. no. 28-3 at 3 of 30. Captain Soucy confirmed that Lieutenant Reardon had authority to send this email to the officers without first obtaining Captain Soucy's approval. Doc. no. 28-1 at 9 of 24. Although Lieutenant Reardon had authority to send the February 5 email, the record reveals that Captain Soucy assisted Lieutenant Reardon in drafting it.

Although the February 5 email did not contain an explicit directive to charge passive panhandlers, Captain Soucy later testified in his deposition that this email was drafted after discussions with the City Solicitor's Office to address concerns over passive panhandlers whom Captain Soucy described as follows:

> [P]anhandlers [who] didn't step into the roadway and . . . stayed on the curbing and/or the grass or whatnot, and didn't impede the flow of traffic by stepping in the roadway and stopping traffic physically with their person, but their actions were causing vehicles or the flow of traffic to be impeded.

Id. at 10 of 24. Captain Soucy confirmed during his deposition that the Disorderly Conduct statute was considered a "first charging option" because it could be applied to passive panhandlers, not just those who stepped into the road. Id. at 13 of 24.

Less than five months after the February 5 email, on July 2, 2015, Captain Soucy sent an email to all MPD officers containing an express directive regarding charging passive panhandlers with obstructing traffic under RSA 644:2, II(c). The email had the subject line "Panhandlers" and advised officers:

> Simply put, if a Panhandler does any of the following — you may use these options:

| | |
|---|---|
| Action: | Panhandler causes traffic to slow or become impeded when accepting donations — even if they're not standing or step into a public way |
| Officer's Option: | Charge with DOC 644:2(c) Obstructing vehicular traffic on any public street |

See doc. no. 28-9 at 37 of 39 (hereinafter "July 2 email"). According to Captain Soucy, he intended the July 2 email to "provide the officers with a simple reading or simple interpretation of what they could and couldn't do based on what the city solicitors had advised us." Doc. no. 28-1 at 15 of 24. Although he had no specific recollection of talking to the Chiefs of Police[1] or the City Solicitor's Office about the July 2 email, Captain Soucy's memory was clear that the July 2 email was consistent with the "city solicitor's view." Id. And

---

[1] Following the retirement of Chief Mara in the summer of 2015, Enoch F. Willard became Chief of Police in Manchester.

Captain Soucy admits that he conveyed that "view" to the MPD officers.  Id.

MPD Sergeant Matthew Larochelle, a former shift supervisor who led daily roll-call meetings with patrol officers, testified at his deposition that the February 5 and July 2 emails were "directive[s] on how to legally handle" issues related to panhandling.  Doc. no. 28-29 at 13 of 19.  Sergeant Larochelle explained that MPD shift supervisors discussed such e-mail directives with the officers during daily roll-call meetings. See id. at 14 of 19.  Captain Soucy also testified that panhandling was "frequently" discussed with the officers during roll-call meetings.  See doc. no. 28-1 at 12 & 15 of 24.

Between the February 5 and July 2 emails, the MPD issued six summonses under RSA 644:2 to passive panhandlers, including the June 3 summons Officer Brandreth issued to Petrello, which is the subject of this lawsuit.  Officer Brandreth testified at his deposition that he relied on the information in the February 5 email when he charged Petrello with disorderly conduct.  See doc. no. 42-2 at 7 of 18.  When asked about guidance or directives he had received from his superiors, Officer Brandreth explained: "Basically one course of conduct for us is if someone doesn't step into the roadway and you can't issue a pedestrian in the roadway motor vehicle summons, you could go the disorderly conduct violation route."  Id. at 6-7 of 18.

Lieutenant Reardon confirmed in his deposition that Officer Brandreth was following department policy when he issued the summons to Petrello:

> Q. So is it fair to say, I mean, this reflected, you know—this reflected department policy as to how to use the disorderly conduct statute against a panhandler who is engaging in disorderly conduct?
>
> A. Right.
>
> Q. Okay. I take it when you send these out these types of documents the expectation is that officers will comply with guidance that's provided, correct?
>
> A. Yes, ideally, yes.

Doc. no. 28-3 at 10 of 30.

Officer Brandreth was not the only officer who acted pursuant to "the recommended policy," id. at 19 of 30, before it appeared as an explicit directive in the July 2 email. Between March 27, 2015 and the July 2 email, four other officers issued five summonses to panhandlers who, like Petrello, did not step into the road to solicit or collect a donation. Following the July 2 email, the MPD issued 13 additional summonses under RSA 644:2 to passive panhandlers who did not step into the road.[2]

---

[2] Between March 2015 and March 2016, the MPD issued a total of 19 summonses to panhandlers who, like Petrello, did not step into the road. See doc. no. 37-2. At least 10 different MPD officers were involved in issuing these 19 summonses. In two of these 19 instances, the "Good Samaritan" driver who stopped a car in the road to give money to the panhandler was also issued a summons for "Stopping/Standing/Parking." Id. at 106 & 110 of 111.

## II. **June 3, 2015 Summons**

On June 3, 2015, Petrello was passively soliciting donations in a public place in Manchester.  Specifically, Petrello was standing on the grassy area between the road and sidewalk on the west side of Maple Street, south of Bridge Street.[3]  Petrello held a sign that said "Veteran" with smaller writing underneath it.  See doc. no. 28-16 at 5 of 15.  Petrello never stepped into the road to either solicit or collect donations.

Officer Brandreth was on patrol at a nearby Seven-Eleven store and noticed Petrello panhandling with her back to the traffic light.  Officer Brandreth saw about seven motorists stopped at a red light hand Petrello items.  Then, while the traffic light was green, a Cadillac driving northbound on Maple Street came to a complete stop and handed something to Petrello.  Petrello took the item from the driver, but she did not step into the road.  When the Cadillac stopped, a Jeep driving behind the Cadillac was forced to stop.  The Cadillac then drove through the intersection, but the light turned red and the Jeep was unable to make it through the intersection.  If the Cadillac had not stopped at the green light, then the Jeep would have

---

[3] At that location, Maple Street is a two-lane, one-way street with traffic heading northbound.

made it through the intersection while the light was still green and would not have had to wait for the next green light.

Officer Brandreth approached Petrello and told her that she could stand on the side of the road when traffic was stopped, but she could not stop cars that were driving on the road. Petrello responded that she did not stop anyone. Officer Brandreth obtained Petrello's driver's license and discovered that she had been issued a summons on May 5, 2015, for being a pedestrian in the roadway. Officer Brandreth then issued Petrello a summons to appear in Manchester District Court on July 9, 2015, for one count of disorderly conduct "for obstructing vehicular traffic" in violation of RSA 644:2, II(c). Id. at 6 of 15. When Petrello asked Officer Brandreth how she was being disorderly, Officer Brandreth responded:

> Based on your behavior, OK, by being out here with the sign panhandling for money, having a car stop and then not allowing that second car who was not able to get through the intersection that it should have, OK, because they had a green light. So you're stopping that person's whole day, that second person. They had to wait for a whole other light cycle change, OK. So we don't want people doing that anymore, OK. I understand you can be out here on the side of the road, that's fine.

Doc. no. 28-18. While he was leaving, Officer Brandreth told Petrello, "So if you can, don't stop any other cars." Id. Petrello responded, "I don't stop them at all. I'm on the side of the road here. I don't stop them. But you have a good day."

Id.  On August 31, 2015, the charge against Petrello was nolle prossed.

Petrello stopped panhandling in Manchester after the charge against her was nolle prossed.  She continued to panhandle "off and on" in Hooksett and Derry until July 2016.  Doc. no. 28-15 at 5 & 11-12 of 12.

### III. **Manchester Ordinance**

In March 2015, the Manchester Board of Mayor and Aldermen began considering a proposed city ordinance, section 70.32, entitled "Passing of Items to or from the Occupant of a Motor Vehicle," to address panhandling in the City (the "Ordinance"). The Ordinance was modeled after an ordinance passed by the City of Concord with nearly identical language.  The Ordinance's stated purpose was "to promote the health safety and welfare of the citizens traveling by vehicle in the City."  See doc. no. 30-5 at 2 of 33.  The Ordinance stated: "No person shall knowingly distribute any item to, receive any item from, or exchange any item with the occupant of any motor vehicle when the vehicle is located in the roadway."  Id.  The Ordinance would not apply if a vehicle were located on a private road, private property, or permitted parking area.  Id.

On March 13, 2015, before the Board of Mayor and Aldermen formally proposed the Ordinance, Lieutenant Reardon spoke with

the Chief of the Concord Police Department about the Concord ordinance.  Lieutenant Reardon reported his findings to Chief Mara.  On March 17, Alderman Joyce Craig sent a memo to the Board of Mayor and Aldermen's Committee on Administration with the subject line "Panhandling Ordinance."  See id. at 1 of 33. Alderman Craig attached to the memo a copy of the proposed Ordinance, a copy of the Concord ordinance, and a New Hampshire Union Leader article about the Concord ordinance.  In the memo, Alderman Craig stated:

> This ordinance has been reviewed by City Solicitor Clark as well as Chief Mara.  Over the years, the City of Manchester has experienced an increase of panhandlers, sometimes aggressive, in the City. Police officers have been actively enforcing state statutes to decrease panhandling.  Adoption of this ordinance will provide officers with another tool to ensure public safety.

Id.  The Committee on Administration discussed the Ordinance at its April 21, 2015 meeting and unanimously recommended that the Board of Mayor and Aldermen approve it.

In April 2015, Captain Soucy issued a Community Policing Division report, which stated in relevant part:

> After discussions with the City of Concord NH on the adoption of their new Panhandling Ordinance, our administration began discussing a similar approach to adopting an ordinance.  The culmination of these efforts resulted in our Board of Mayor and Alderm[e]n adopting a similar ordinance here in Manchester.  The City Solicitor's office has been tasked with reviewing and finalizing the ordinance, which targets both the panhandler AND the motorist who exchange or receive any item between each other.  Our hope is to have an

> additional tool in the way of this new ordinance to
> help curb the panhandler activity which ultimately
> impedes the free flow of traffic and at times, places
> the motorists and panhandler at risk of injury.

Doc. no. 28-12 at 5 of 6.

On May 5, 2015, the full Board of Mayor and Aldermen considered the Ordinance. Manchester Mayor Ted Gatsas stated that "[w]e have an awful situation with this panhandling. If you said to me what are the most calls we get in our office right now it is about panhandlers." Doc. no. 30-5 at 14 of 33. During the meeting, several members of the Board expressed free speech concerns related to the Ordinance. Alderman Garth Corriveau stated that "if this went into a court they would look at the minutes of this meeting and say everyone is talking about panhandling so of course it is about panhandling." Id. at 16 of 33. Deputy City Solicitor Thomas Arnold said that the Ordinance was designed to regulate conduct, not speech, and that it must be uniformly applied. Id. He stated that "[y]ou can't apply this ordinance solely to a panhandler. You have to apply it to everyone because you are regulating the conduct not the speech." Id. Additionally, Chief Mara, who was present at the meeting, said, "I think there is a real problem right now with the issue of people stepping out and stopping traffic, motorists, as well as the people that are panhandling." Id. at 13 of 33. He explained that "[a]nybody that is out there we have to treat

13

them the same.  We can't just focus in on panhandlers."  <u>Id.</u> at
14 of 33.  The Board of Mayor and Aldermen voted to approve the
Ordinance.  The City ultimately enacted the Ordinance on October
6, 2015.  <u>See</u> Manchester, N.H., Code of Ordinances § 70.32
(2015).

In March 2016, Legal Division Captain Maureen Tessier
became aware that the City had enacted the Ordinance and
informed MPD officers that they could enforce the Ordinance.
The MPD's understanding was that the Ordinance was intended to
apply to both motorists and pedestrians.  Between March and
December 2016, the MPD issued seven summonses under the
Ordinance to six individuals—all panhandlers.  In December 2016,
following Lieutenant Reardon's deposition in this case and
consultation with the City Solicitor's Office, the MPD decided
to cease enforcing the Ordinance until the conclusion of this
litigation.  In January 2017, the MPD informed its officers to
refrain from enforcing the Ordinance.

## DISCUSSION

In her second amended complaint, Petrello brings five
claims against the City under 42 U.S.C. § 1983, three based on
the June 3, 2015 summons and two challenging the Ordinance.  <u>See</u>
doc. no. 9.  In her objection to the City's motion for summary
judgment, Petrello voluntarily dismisses Count V, her equal

protection claim concerning the Ordinance.  <u>See</u> doc. no. 38 at 1

n.1.  The parties move separately for summary judgment on Counts

I-IV.  At oral argument, the parties agreed that there are no

genuine issues of material fact and the remaining claims raise

only questions of law that should be resolved on summary

judgment.  The court first addresses Petrello's <u>Monell</u> claims

based on the June 3, 2015 summons before turning to her First

Amendment challenge to the Ordinance.

## I.  <u>Monell Claims (Counts I-III)</u>

In Counts I-III, Petrello alleges that the City established

an unconstitutional policy or custom regarding panhandlers,

which Officer Brandreth enforced against Petrello in violation

of her First, Fourth, and Fourteenth Amendment rights.

Specifically, Petrello challenges the enforcement of a policy

that charges panhandlers who, like Petrello, never step into the

road while panhandling.  Petrello does not challenge the

enforcement of RSA 644:2, II(c) with respect to panhandlers who

step into the road while panhandling.

### A. <u>Existence of a City Policy or Custom</u>

Petrello alleges that the MPD developed and implemented a

policy or custom, attributable to the City, to charge

panhandlers for allegedly "obstructing vehicular traffic on

public streets" in violation of New Hampshire's disorderly

15

conduct statute, see RSA 644:2, II(c), even when the panhandlers do not step into the road. Doc. no. 9 at ¶ 7.

Municipalities "can be sued directly under § 1983 for monetary, declaratory, or injunctive relief" for alleged constitutional violations arising from "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers" or a "governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91 (1978). "Monell is a case about responsibility." Pembaur v. City of Cincinnati, 475 U.S. 469, 478 (1986). Under § 1983, municipalities cannot be held liable for the constitutional violations of their employees based on a respondeat superior theory of liability. Monell, 436 U.S. at 691. Rather, "municipalities can be liable for constitutional violations only if the violation occurs pursuant to an official policy or custom." Welch v. Ciampa, 542 F.3d 927, 941 (1st Cir. 2008). Thus, a plaintiff who brings a § 1983 action against a municipality must identify a "policy" or "custom" attributable to the municipality that was the cause of and the "moving force" behind the injury alleged. Haley v. City of Boston, 657 F.3d 39, 51 (1st Cir. 2011) (quoting Bd. of Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 403-04 (1997)).

In her summary judgment motion, Petrello argues that MPD officials with final policymaking authority for the City established an official "policy" to enforce RSA 644:2, II(c) against panhandlers who do not step into the road.  In the alternative, Petrello argues that the MPD developed a "custom" of enforcing RSA 644:2, II(c) against such passive panhandlers.[4] The City contends that this alleged policy cannot support a Monell claim because only the Manchester Chief of Police has authority to make final police department policy for the City and the Chief did not approve the policy in this case.

To prove the existence of an official policy under Monell, a plaintiff can show that "the alleged constitutional injury was caused by a formal decision of a municipal legislative body or by a person with final policymaking authority." Welch, 542 F.3d at 941 (internal citations omitted).  "Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and of course, whether an official had final policymaking authority is a question of state law." Pembaur, 475 U.S. at 483; cf. St. Louis v. Praprotnik, 485 U.S. 112, 126 (1988) ("If . . . a city's lawful policymakers could insulate

_____

[4] Petrello also initially raised a "failure to train" claim against the City, see City of Canton v. Harris, 489 U.S. 378, 388 (1989), but she subsequently withdrew that claim at oral argument.

the government from liability simply by delegating their policymaking authority to others, § 1983 could not serve its intended purpose.").  "In a § 1983 suit based on an official policy promulgated by officials with final policymaking authority, attribution to the municipality is easily established."  Baron v. Suffolk Cty. Sheriff's Dep't, 402 F.3d 225, 236 (1st Cir. 2005) (citing Pembaur, 475 U.S. at 480).

Even in the absence of an official policy formally adopted by a final policymaker, a municipality can still be held liable for an unconstitutional custom or practice that is "so well settled and widespread that the policy making officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice."  Baron, 402 F.3d at 236-37 (quoting Bordanaro v. McLeod, 871 F.2d 1151, 1156 (1st Cir. 1989)); see also Praprotnik, 485 U.S. at 130 (noting that a municipality can be liable when "a series of decisions by a subordinate official manifested a 'custom or usage' of which the supervisor must have been aware").  "A municipality can be held liable if its police chief is a policymaker and acquiesces in a police custom or policy as to which he has actual or constructive knowledge."  Kinan v. City of Brockton, 876 F.2d 1029, 1035 (1st Cir. 1989).

The Manchester Chief of Police has final policymaking authority to make police department policy for the City.  See

<u>Rossi v. Town of Pelham</u>, 35 F. Supp. 2d 58, 73 (D.N.H. 1997)
(citing RSA 105:2-a). There is evidence that suggests that the
Chief may have delegated final policymaking authority on the
issue of panhandling to Captain Soucy, which would warrant
<u>Monell</u> liability based on departmental "policy," but that
question is properly resolved by a jury. The record is
insufficient for the court to rule in Petrello's favor on this
question as a matter of law. On the question of "custom or
practice," however, the record is sufficient to find as a matter
of law that that the City is the responsible actor here.

In a typical case where a plaintiff tries to establish a
police department's custom or practice under <u>Monell</u>, there is no
documentary evidence, or "paper trail," that contains an express
directive to the officers to do the very thing which the
plaintiff alleges is unconstitutional. Nor is there typically a
set of depositions from the key officers involved in which they
unanimously agree that the challenged conduct occurred pursuant
to an official directive. But, this is precisely the kind of
evidence the jury would hear in this case.

First, while it is not clear that the Chief of Police
delegated final policymaking authority to Captain Soucy or
Lieutenant Reardon, it is clear that they both viewed their
roles as policymakers for the City on the issue of panhandling.
Captain Soucy made clear that he discussed questions of policy

on panhandling with the Chief and the Assistant Chief at "command meetings." Doc. no. 28-1 at 4 of 24. Captain Soucy described conversations about panhandling occurring "ad nauseam" within the MPD, including during roll-call trainings. Id. at 12 of 24. And both Captain Soucy and Lieutenant Reardon included the City Solicitor's Office in the discussions that led to the decision in February 2015 to enforce the Disorderly Conduct statute against the "passive" panhandlers. On this record, it is difficult to imagine that the Chief lacked constructive knowledge of the decision in February 2015 to charge "passive" panhandlers, like Petrello, who did not step into the road.

Second, the evidence is undisputed that when Officer Brandreth summonsed Petrello, he was not acting as some sort of "rogue officer" who was relying on his own interpretation of the Disorderly Conduct statute. Lieutenant Reardon confirmed that Officer Brandreth's issuance of the summons to Petrello "reflected department policy as to how to use the disorderly conduct statute against a panhandler who is engaging in disorderly conduct." Doc. no. 28-3 at 10 of 30; see also id. at 19 of 30 (testifying that Officer Brandreth was "following the recommended policy" when he charged Petrello with disorderly conduct). And, Officer Brandreth testified that he was acting pursuant to the guidance contained in the February 5 email when he issued the summons to Petrello. See doc. no. 42-2 at 7 of

18.  Indeed, Lieutenant Reardon, who was tasked with issuing "policy directives" to MPD officers, doc. no. 28-3 at 3 of 30, sent the February 5 email to the officers, including Officer Brandreth, with "the expectation . . . that officers will comply with the guidance" that it provided.  Id. at 10 of 30.

Third, even though Captain Soucy's July 2 email post-dated Petrello's summons, that email provides direct evidence to support a finding that it was the custom or practice of the MPD to enforce the disorderly conduct statute against passive panhandlers like Petrello.  The July 2 email directs officers to do precisely what Officer Brandreth did in Petrello's case.

Finally, the record contains evidence of multiple incidents of officers acting pursuant to the custom or practice.  Between March 2015 and March 2016, the record reveals that at least 10 different MPD officers were involved in issuing a total of 19 summonses to panhandlers who, like Petrello, did not step into the road.  Thus, the incidents were widespread and they involved many different officers.

In sum, the record reveals that Chiefs Mara and Willard—final policymakers for the City—either knew or should have known about this MPD custom or practice, yet did nothing to end it.  More importantly, there is nothing in the record to suggest that Chief Mara or Willard in any way disapproved of this custom.  The totality of this record supports only one reasonable

conclusion: the City is responsible for a custom or practice of charging passive panhandlers, like Petrello, with disorderly conduct under RSA 644:2, II(c) (hereinafter, "MPD Policy"). Because the City does not dispute, nor could it on this record, that the MPD Policy was the cause of and the "moving force" behind Officer Brandreth's decision on June 3, 2015 to issue the summons to Petrello, see Bordanaro, 871 F.2d at 1156, the court holds that Petrello has satisfied the threshold test for Monell liability.[5]

The City is liable under Monell, however, only if Officer Brandreth's actions violated Petrello's constitutional rights. Petrello claims violations of her First, Fourth, and Fourteenth Amendment rights. Taking the claims out of sequential order, the court deals first with Count II, Petrello's claim that her First Amendment rights were violated.

B. First Amendment Claim (Count II)

Both the City and Petrello move for summary judgment on this claim. For the reasons that follow, the City's motion is denied and Petrello's motion is granted.

---

[5] It is undisputed that Officer Brandreth acted pursuant to Lieutenant Reardon's February 5 email and "recommended policy" when he issued the summons to Petrello. See doc. no. 28-3 at 19 of 30; doc. no. 42-2 at 7 of 18.

1. City's Motion

The City argues that it is entitled to summary judgment on this claim because the court previously granted Officer Brandreth qualified immunity.  The court granted Officer Brandreth qualified immunity on Petrello's First Amendment claim, however, because "as of June 3, 2015, there was no clearly established law prohibiting an officer from issuing a summons to a panhandler whom he reasonably believed was obstructing traffic." Petrello v. City of Manchester, No. 16-cv-008-LM, 2017 WL 1080932, at *6 (D.N.H. Mar. 21, 2017).  In so ruling, the court did not reach the underlying issue of whether Officer Brandreth violated Petrello's First Amendment rights when he gave her the disorderly conduct summons under RSA 644:2, II(c).

"Unlike individual defendants, municipalities are not entitled to qualified immunity." Walden v. City of Providence, 596 F.3d 38, 55 n.23 (1st Cir. 2010); see also Owen v. City of Independence, 445 U.S. 622, 638 (1980).  Thus, "it is not impossible for a municipality to be held liable for the actions of lower-level officers who are themselves entitled to qualified immunity." Joyce v. Town of Tewksbury, 112 F.3d 19, 23 (1st Cir. 1997).

Citing Joyce, the City argues that it is entitled to summary judgment because the law was not clearly established

when Officer Brandreth gave her the summons and, therefore, the City could not have been deliberately indifferent to Petrello's First Amendment rights.  The City's argument is misplaced.

In Joyce, the plaintiff brought several claims against police officers who entered her home without a search warrant and also sued the town under § 1983, alleging that the town's failure to properly train and supervise its police officers caused the officers to unlawfully enter her home.  See id.  The First Circuit concluded that the individual officers were entitled to qualified immunity because "the unsettled state of the law made it reasonable to believe" their conduct was constitutional.  Id.  Based on that conclusion, the First Circuit held that the town could not be liable under § 1983 for failing to properly train and supervise its police officers because the town "could not have been deliberately indifferent to citizens' rights in failing to teach the officers that their conduct was unconstitutional."  Id. (internal quotation marks and citation omitted).

Unlike the plaintiffs in Joyce, Petrello does not allege that the City is liable under § 1983 for failing to train and supervise its police officers.  In fact, Petrello disclaimed her failure to train theory at oral argument.  Rather, Petrello alleges that the MPD Policy itself is unconstitutional, which

caused Officer Brandreth to violate her First Amendment rights. This distinction is important.

"If the allegation against the municipality involves a failure to train, the plaintiff must put forth evidence of a failure to train that amounts to 'deliberate indifference to the rights of persons with whom the police come into contact.'" Fletcher v. Town of Clinton, 196 F.3d 41, 55 (1st Cir. 1999) (quoting City of Canton, 489 U.S. at 388). In such a case, "a finding that the law was not clearly established may foreclose municipal liability for failure to train." Id. at 56 (citing Joyce, 112 F.3d at 23). However, when a plaintiff claims that a municipal policy itself is unconstitutional, "resolving [the] issues of fault and causation is straightforward." Brown, 520 U.S. at 404; see also Haley, 657 F.3d 51-52 (describing the different standard for establishing failure to train claims); Rossi, 35 F. Supp. 2d at 78 n.1 ("[F]or a municipal policy that is either facially unlawful or directs unlawful conduct, plaintiffs need not further establish 'deliberate indifference.'" (citing Pembaur, 475 U.S. at 479)).

Without a failure to train claim, Petrello's case is distinguishable from Joyce. In short, a municipality can be held accountable for violations of federal law regardless of whether the relevant federal law was clearly established at the time the municipality committed the violation. Municipal

liability is not foreclosed simply because the relevant law was not clearly established when Officer Brandreth charged Petrello with disorderly conduct.  Cf. Askins v. Doe, 727 F.3d 248, 254 (2d Cir. 2013) ("Municipalities are held liable if they adopt customs or policies that violate federal law and result in tortious violation of a plaintiff's rights, regardless of whether it was clear at the time of the adoption of the policy or at the time of the tortious conduct that such conduct would violate the plaintiff's rights." (citing Owen, 445 U.S. at 656-57)).  Accordingly, the court **DENIES** the City's motion for summary judgment on Count II.

### 2. Petrello's Motion

In her summary judgment motion, Petrello contends that Officer Brandreth's actions pursuant to the MPD Policy violated her First Amendment rights.  "The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws 'abridging the freedom of speech.'"  Reed v. Town of Gilbert, 135 S. Ct. 2218, 2226 (2015) (quoting U.S. Const. amend. I).  The court's First Amendment analysis begins with a three-part inquiry designed to ascertain the type of speech at issue, the location of the speaker, and the nature of the government regulation.  See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 797 (1985).  Once the court

defines the nature of the speech, forum, and regulation at issue, the court then applies the appropriate level of scrutiny to the regulation.

Generally speaking, government regulations that restrict protected speech in a traditional public forum receive the highest scrutiny if they are directed at the content of speech; such restrictions are presumptively unconstitutional.  See Reed, 135 S. Ct. at 2226.  Government regulation aimed at conduct, or restrictions on the time, place, or manner of speech in a traditional public forum receive a more deferential, but still demanding form of review.  See Cutting v. City of Portland, 802 F.3d 79, 86-87 (1st Cir. 2015).  In short, the government's ability to restrict protected speech in traditional public forums like public streets and sidewalks is "very limited." United States v. Grace, 461 U.S. 171, 177 (1983); see also Cutting, 802 F.3d at 83 ("Given the role such places historically have played in fostering public discussion and debate, the government's authority to regulate speech within such places is especially limited.").

Here, there is no dispute that Petrello was engaged in protected speech in a traditional public forum.  To determine the level of scrutiny to apply, the court must determine whether the MPD Policy was content based or content neutral.

a. <u>Content Based or Content Neutral</u>

"Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." <u>Reed</u>, 135 S. Ct. at 2227. First, courts must decide "whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." <u>Id.</u> (citation omitted). Second, a facially neutral law will be deemed content based if the law "cannot be 'justified without reference to the content of the regulated speech'" or was "adopted by the government 'because of disagreement with the message [the speech] conveys.'" <u>Id.</u> (alteration in original) (quoting <u>Ward v. Rock Against Racism</u>, 491 U.S. 781, 791 (1989)). On the other hand, "a regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." <u>Ward</u>, 491 U.S. at 791 (1989). "Government regulation of expressive activity is content neutral so long as it is justified without reference to the content of the regulated speech." <u>Id.</u> (internal quotation marks omitted).

Because the MPD implemented the MPD Policy to curtail panhandling, as opposed to a broader category of speech, Petrello urges that the MPD Policy is thereby necessarily content based. The MPD Policy does not, however, direct

officers to enforce RSA 644:2, II(c) based on the content of a speaker's message. The February 5 and July 2 emails reference panhandlers, but not in terms of any message the panhandler is conveying, such as requests for donations. Cf. McLaughlin v. City of Lowell, 140 F. Supp. 3d 177, 187 (D. Mass. 2015). Rather, the MPD Policy calls on individual officers to decide whether the presence of a panhandler causes an obstruction of traffic at an intersection.

Officer Brandreth's conduct was perfectly consistent with this content-neutral approach. Officer Brandreth did not issue Petrello the summons because he, or anyone else, disagreed with the content of her speech. The record contains nothing to suggest that Officer Brandreth even considered the message being conveyed. He issued Petrello the summons only after he witnessed a car stop to hand her money at a green light, which in turn caused a second car to stop and thereby miss the green light. In the end, however, the court need not resolve the question of whether the MPD Policy is content based, because it does not survive scrutiny as a content-neutral regulation. See Rideout v. Gardner, 838 F.3d 65, 72 n.4 (1st Cir. 2016).

### b. The MPD Policy is Not Narrowly Tailored

Analyzed as a content-neutral restriction, the MPD Policy does not survive intermediate scrutiny. "Content-neutral

restrictions are subject to intermediate scrutiny, which demands
that the law be 'narrowly tailored to serve a significant
governmental interest.'" Rideout, 838 F.3d at 71-72 (quoting
Ward, 491 U.S. at 791). To survive intermediate scrutiny, the
restriction must "not burden substantially more speech than is
necessary to further the government's interest." Cutting, 802
F.3d at 87 (internal quotation marks omitted). The government
bears the burden of proving that a speech restriction is
narrowly tailored. See United States v. Playboy Entm't Grp.,
Inc., 529 U.S. 803, 816 (2000).

RSA 644:2, II(c) makes it unlawful to "[o]bstruct[]
vehicular or pedestrian traffic on any public street or sidewalk
or the entrance to any public building." The statute——and the
MPD Policy applying the statute——are clearly intended to promote
public safety and ensure the free flow of traffic, which the
court recognizes are significant and legitimate government
concerns. See, e.g., McCullen, 134 S. Ct. at 2535; Madsen v.
Women's Health Ctr., Inc., 512 U.S. 753, 768 (1994); Cutting,
802 F.3d at 86. However, the MPD Policy burdens substantially
more speech than necessary to further those legitimate
interests.

On these facts, where a panhandler, like Petrello, remains
on the grass and never steps into the road, it is difficult to
understand how charging that person with obstructing traffic

serves the City's interest in promoting traffic safety. Petrello stood on the sidewalk passively holding a sign; she did not physically obstruct the flow of traffic on the street. While the traffic stoppage would not have occurred but-for Petrello's panhandling, it was the driver of the Cadillac, the "Good Samaritan," who ignored the traffic signal, stopped in the road while the light was green, and caused the Jeep to miss the green light. To the extent there was conduct that could constitute "obstructing vehicular traffic," the responsible party would be the driver of the Cadillac.

During his deposition, Officer Brandreth confirmed that he charged Petrello with disorderly conduct because the driver of the Cadillac stopped at a green light in response to her speech and caused "the traffic to back up . . . ." See doc. no. 42-2 at 7 & 11 of 18. It is undisputed that Petrello faced criminal charges based on a third party's reaction to her protected speech. This is not a narrowly tailored approach to addressing traffic safety problems. Cf. Stahl v. City of St. Louis, 687 F.3d 1038, 1041 (8th Cir. 2012) ("The fact that a person only violates the ordinance if his or her action evokes a particular response from a third party is especially problematic because of the ordinance's resulting chilling effect on core First Amendment speech."); Forsyth Cty. v. Nationalist Movement, 505

U.S. 123, 134 (1992) ("Listeners' reaction to speech is not a content-neutral basis for regulation.").

Further, Petrello had no control over the timing of the traffic light.  If the light had stayed green for a few seconds longer, the Jeep presumably would have made it through the intersection and Officer Brandreth would not have charged Petrello with obstructing traffic.  If the traffic light had been red when the driver of the Cadillac stopped and handed Petrello money, Officer Brandreth would not have given her a summons.  Under either scenario, Petrello's conduct would have been the same: she would have been standing by the side of the road holding her sign, never stepping into the road.  Under these circumstances, Petrello can ensure that Officer Brandreth will not charge her with disorderly conduct only if she leaves the sidewalk and stops panhandling.  In this way, the MPD Policy operates as a de facto ban on panhandling (by those like Petrello who do not step into the road) and thereby chills substantially more speech than necessary to serve the City's interests.

The City has other available measures to address its legitimate interests in promoting public safety and preventing traffic obstructions.  For instance, the City could limit enforcement to panhandlers who step into the road and obstruct traffic.  Or, the City could enforce the statute against

32

motorists who stop in the road at a green light, thereby causing a traffic obstruction. See RSA 644:2, II(c); see also RSA 265:69 (prohibiting stopping, standing, or parking a vehicle on the roadway). Either approach to enforcement would serve the City's interests and would not sweep so broadly as to capture the passive panhandler.

While it may be easier to stop stationary panhandlers than motorists, the City may not use convenience or efficiency as a proxy for the narrow tailoring test. Rather, "[t]o meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." McCullen, 134 S. Ct. at 2540; see also id. ("A painted line on the sidewalk is easy to enforce, but the prime objective of the First Amendment is not efficiency.").

For these reasons, the MPD Policy is not narrowly tailored and Officer Brandreth's enforcement of the MPD Policy violated Petrello's First Amendment right to free speech. The City is therefore liable for Officer Brandreth's enforcement of this unconstitutional custom or practice. Accordingly, the court **GRANTS** Petrello's motion for summary judgment on Count II.

c. Relief

Petrello seeks declaratory and injunctive relief against the City, as well as compensatory damages for the City's violation of her First Amendment rights.

Petrello asks the court to permanently enjoin the City from charging panhandlers, including Petrello, for obstructing vehicular traffic under RSA 644:2, II(c), when the panhandlers do not step into the road.  Petrello seeks a tailored injunction based on the circumstances presented in this case.  See Dayton Bd. of Educ. v. Brinkman, 433 U.S. 406, 420 (1977) ("Once a constitutional violation is found, a federal court is required to tailor the scope of the remedy to fit the nature and extent of the constitutional violation." (internal quotation marks omitted)).

A plaintiff seeking a permanent injunction must demonstrate:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006). Petrello has satisfied each of these factors and demonstrated that a permanent injunction is appropriate in this case.

First, Petrello has shown irreparable injury because
enforcement of the MPD Policy violated her First Amendment
rights.  See Elrod v. Burns, 427 U.S. 347, 373 (1976) ("The loss
of First Amendment freedoms, for even minimal periods of time,
unquestionably constitutes irreparable injury.").  Second,
Petrello has inadequate remedies at law to compensate for the
loss of her First Amendment rights and to protect those rights
should she panhandle in the future.  See Legend Night Club v.
Miller, 637 F.3d 291, 302 (4th Cir. 2011) ("[M]onetary damages
are inadequate to compensate for the loss of First Amendment
freedoms." (citing Joelner v. Vill. of Wash. Park, 378 F.3d 613,
620 (7th Cir. 2004))); Nat'l People's Action v. Vill. of
Wilmette, 914 F.2d 1008, 1013 (7th Cir. 1990) ("[I]njunctions
are especially appropriate in the context of first amendment
violations because of the inadequacy of money damages.").
Moreover, continued enforcement of the MPD Policy may have a
chilling effect on the First Amendment rights of panhandlers in
the City.  Third, the balance of hardships weighs in Petrello's
favor, as the deprivation of First Amendment rights and
preventing the unconstitutional enforcement of a statute
outweigh any burden that a narrowly tailored injunction may
impose on the City.  Cf. Legend Night Club, 637 F.3d at 302-03
(state "is in no way harmed by issuance of an injunction
that prevents the state from enforcing unconstitutional

restrictions" (citing Joelner, 378 F.3d at 620)).  Finally,
protecting First Amendment rights is in the public interest.

Accordingly, the court **GRANTS** Petrello's requests for
declaratory relief and a permanent injunction prohibiting the
City from enforcing RSA 644:2, II(c) against passive panhandlers
under the circumstances presented in this case.

Finally, Petrello seeks compensatory damages for the City's
violation of her First Amendment rights.  See Memphis Cmty. Sch.
Dist. v. Stachura, 477 U.S. 299, 307 (1986) ("[T]he basic
purpose of § 1983 damages is to compensate persons for injuries
that are caused by the deprivation of constitutional rights."
(internal quotation marks and emphasis omitted)).  With respect
to Petrello's First Amendment claim, the only issue remaining
for trial is the appropriate measure of damages resulting from
the June 3, 2015 incident.

C. Fourth Amendment Claim (Count I)

In Count I, Petrello alleges that Officer Brandreth, acting
pursuant to the MPD Policy, violated her "clearly established
right to be free from unreasonable seizures by detaining her
without reasonable suspicion that she was committing a crime and
issuing her a summons without probable cause that she had
violated RSA 644:2(II)(c)."  Doc. no. 9 at ¶ 72.  The court
previously found that Officer Brandreth was entitled to

qualified immunity on Count I because he had at least "arguable probable cause" to charge Petrello with violation-level disorderly conduct and "an arguable basis for reasonable suspicion, a lower standard than probable cause, for an investigative stop." Petrello, 2017 WL 1080932, at *4-5 & n.5. As the court explained, "[q]ualified immunity 'requires a somewhat lesser showing' than probable cause . . . ." Id. at *3 (quoting Cox v. Hainey, 391 F.3d 25, 31 (1st Cir. 2004)); see also Glik v. Cunniffe, 655 F.3d 78, 88 (1st Cir. 2011) ("Officers are entitled to qualified immunity so long as the presence of probable cause is at least arguable." (internal quotation marks omitted)). Though the court held that Officer Brandreth was immune from individual liability, the court did not address whether he violated Petrello's Fourth Amendment rights, such that the City is liable under Monell.

Petrello contends that she did not obstruct or impede traffic because she never stepped into the road. As such, she argues that Officer Brandreth lacked reasonable suspicion to conduct an investigatory stop and probable cause to give her a summons under RSA 644:2, II(c). The City argues that Officer Brandreth had at least reasonable suspicion to stop Petrello.

The Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. "A Fourth Amendment seizure occurs when a police officer 'has in some way restrained the

liberty of a citizen' through 'physical force or show of authority.'" United States v. Camacho, 661 F.3d 718, 725 (1st Cir. 2011) (quoting Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968)). "The protections of the Fourth Amendment apply not only to traditional arrests, but also to those brief investigatory stops generally known as Terry stops." Id. at 724.

Here, Officer Brandreth conducted an investigatory stop; he briefly detained Petrello when he inquired about her panhandling and obtained her license. A "police officer may briefly detain an individual for questioning if the officer 'reasonably suspects that the person apprehended is committing or has committed a crime.'" Id. at 726 (quoting Arizona v. Johnson, 555 U.S. 323, 323 (2009)); see also Eldredge v. Town of Falmouth, 662 F.3d 100, 106 (1st Cir. 2011) ("An investigatory stop, commonly known as a Terry stop, requires only articulable facts giving rise to a reasonable suspicion that a suspect may be involved in criminal activity." (internal quotation marks omitted)). "[R]easonable suspicion requires more than a mere hunch but less than probable cause." United States v. Ruidiaz, 529 F.3d 25, 29 (1st Cir. 2008). The court must therefore determine whether Officer Brandreth had a "reasonable, articulable suspicion" that Petrello had committed or was about to commit a crime. Id. at 28.

Officer Brandreth observed Petrello standing adjacent to the road soliciting donations. He saw a Cadillac stop at a green light and hand Petrello a donation, which in turn forced the Jeep to stop and miss the green light. Based on that sequence of events, Officer Brandreth observed what he thought was, or was about to be, a violation of RSA 644:2, II(c). Considering the totality of the circumstances, the court finds that Officer Brandreth had reasonable suspicion to believe that Petrello may have been engaging in or was about to engage in conduct that would cause an obstruction of vehicular traffic in violation of RSA 644:2, II(c). As such, Officer Brandreth did not violate Petrello's Fourth Amendment rights when he briefly detained her to conduct an investigatory stop.

Petrello further alleges that issuance of the summons itself was an unreasonable seizure because Officer Brandreth did not have probable cause to believe that she had committed a crime. Petrello contends that the summons constituted a restraint on her liberty because it required her to attend court on a future date. In its order granting Officer Brandreth qualified immunity, the court did not address whether his issuance of the summons constituted a separate seizure for Fourth Amendment purposes. The court now answers that question in the negative: the summons requiring Petrello to attend court at a future date was not a Fourth Amendment seizure, nor did it

elevate the investigatory stop, which required only reasonable suspicion, to a detention requiring probable cause.

In Britton v. Maloney, 196 F.3d 24, 29-30 (1st Cir. 1999), the First Circuit held that the issuance of a criminal summons alone, absent an arrest or other detention, did not constitute a seizure for Fourth Amendment purposes. In Britton, the plaintiff received a summons in the mail to appear in court on criminal charges, but he was not arrested or detained. See 196 F.3d at 29. The charges against Britton were ultimately dismissed at a subsequent hearing. Id. Britton brought a claim for malicious prosecution under the Fourth Amendment, arguing that the summons alone constituted an unreasonable seizure because it threatened him with arrest if he failed to appear in court. See id.

The court rejected Britton's claim because his criminal prosecution "did not impose any restrictions on his liberty other than the legal obligation to appear in court at a future date." Id. The court explained that the issuance of a summons does not constitute a Fourth Amendment seizure "simply because it threatens a citizen with the possibility of confinement if he fails to appear in court." Id. at 30 (emphasis in original). The First Circuit concluded:

> Absent any evidence that Britton was arrested,
> detained, restricted in his travel, or otherwise
> subject to a deprivation of his liberty before the

charges against him were dismissed, the fact that he
was given a date to appear in court is insufficient to
establish a seizure within the meaning of the Fourth
Amendment.

Id.

In DiBella v. Borough of Beachwood, 407 F.3d 599 (3d Cir.
2005), the Third Circuit made clear that a police officer's in-
person issuance of a summons was not a seizure for Fourth
Amendment purposes.  In DiBella, the defendants were handing out
literature to pedestrians, bicyclists, and drivers stopped at a
traffic light.  See 407 F.3d at 600.  A police officer
approached the defendants and told them to leave the area.  Id.
When they refused, the officer issued them summonses for defiant
trespass.  Id.  After the criminal charges against them were
dismissed on appeal, the defendants brought a § 1983 claim for
malicious prosecution predicated on the Fourth Amendment.  Id.
at 600-01.  The Third Circuit rejected the malicious prosecution
claim, holding that the defendants were not seized for Fourth
Amendment purposes.  See id. at 602-03.  The court explained
that the defendants "were only issued a summons; they were never
arrested; they never posted bail; they were free to travel; and
they did not have to report to Pretrial Services."  Id. at 603.

Based on the reasoning in Britton and in DiBella, the court
holds that Officer Brandreth's issuance of the summons did not
constitute a separate Fourth Amendment seizure and did not

41

elevate the investigatory stop to a detention requiring probable cause. Cf. Burg v. Gosselin, 591 F.3d 95, 98 (2d Cir. 2010) ("[T]he issuance of a pre-arraignment, non-felony summons requiring a later court appearance, without further restrictions, does not constitute a Fourth Amendment seizure."); Bielanski v. Cty. of Kane, 550 F.3d 632, 642 (7th Cir. 2008) ("[A] summons alone does not equal a seizure for Fourth Amendment purposes. To hold otherwise would transform every traffic ticket and jury summons into a potential Section 1983 claim.").

In sum, Officer Brandreth did not violate Petrello's Fourth Amendment rights because, as discussed above, he had reasonable suspicion to briefly detain her. Accordingly, the court **GRANTS** the City's motion for summary judgment on Count I.

D. Fourteenth Amendment Claim (Count III)

In Count III, Petrello alleges that the MPD Policy, and Officer Brandreth's application of the policy, violated her Fourteenth Amendment right to equal protection. She argues that the MPD Policy discriminates against panhandlers, who are disproportionately poor and homeless, and bears no rational relationship to the City's stated goal of addressing public safety. The City argues that it is entitled to summary judgment because Petrello has offered no evidence of discrimination.

"The Fourteenth Amendment's Equal Protection Clause prohibits a state from treating similarly situated persons differently because of their classification in a particular group." Mulero-Carrillo v. Román-Hernández, 790 F.3d 99, 105-06 (1st Cir. 2015).

> To establish an equal protection claim, a plaintiff needs to allege facts showing that (1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.

Davis v. Coakley, 802 F.3d 128, 132-33 (1st Cir. 2015) (internal quotation marks and citations omitted). "An individual is 'similarly situated' to others for equal protection purposes when 'a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated.'" Id. at 133 (quoting Barrington Cove Ltd. P'ship v. R.I. Hous. & Mortg. Fin. Corp., 246 F.3d 1, 8 (1st Cir. 2001)). "Some evidence of actual disparate treatment is a 'threshold requirement' of a valid equal protection claim." Ayala—Sepúlveda v. Municipality of San Germán, 671 F.3d 24, 32 (1st Cir. 2012) (citation omitted). To meet that requirement, Petrello must "identify and relate specific instances where persons situated similarly in all relevant aspects were treated differently," to show that she was "singled out for unlawful

oppression." Id. (emphasis in original) (internal quotation marks omitted). She has not done so.

Petrello has failed to show that the MPD treated similarly situated "non-panhandlers" differently than it treated her. She merely speculates that the MPD observed "non-panhandlers" engaged in roadside speech similar to Petrello's panhandling, such as campaigning politicians or protesters, and did not charge those individuals with disorderly conduct. Despite Petrello's speculation, the record contains no evidence that MPD officers observed and failed to charge any similarly situated "non-panhandlers." Absent actual evidence of disparate treatment, Petrello has failed to establish the threshold requirement of an equal protection claim. Accordingly, the court **GRANTS** the City's motion for summary judgment on Count III.

## II.  **First Amendment Challenge to the Ordinance (Count IV)**

In addition to her three Monell claims stemming from the June 3, 2015 incident, Petrello brings a First Amendment challenge to the Ordinance. In Count IV, Petrello contends that the Ordinance violates the First Amendment, both on its face and as applied.

The Ordinance states: "No person shall knowingly distribute any item to, receive any item from, or exchange any item with

the occupant of any motor vehicle when the vehicle is located in the roadway."  Manchester, N.H., Code of Ordinances § 70.32(C)(1).  The Ordinance defines "item" as "[a]ny physical object."  70.32(B).  The Ordinance defines "roadway" as "[a]ll public roads open to motorized vehicles within the city exclusive of private roads, private property and areas in which parking is permitted in the city."  Id..  The Ordinance contains several exceptions:

- "This section shall not apply to the distribution, receipt or exchange of any item with the occupant of a motor vehicle on private property or in a permitted parking area."  70.32(C)(2).

- "This section shall not apply to any law enforcement officer acting in the scope of his or her official duty." 70.32(D).

- "This section shall not apply to the distribution, receipt, or exchange of any item with the occupant of a motor vehicle located in the roadway in order to assist the occupant after a motor vehicle accident, with a disabled motor vehicle or where the occupant is experiencing a medical emergency."  70.32(E).

The language of the Ordinance is straightforward: it prohibits an individual from passing an item to or receiving an item from the occupant of a car on a public road.  The Ordinance is silent on the location of the pedestrian who passes or receives the item.  Thus, regardless of whether a pedestrian is standing in the street, the sidewalk, a traffic median, or a

driveway, she violates the Ordinance by exchanging an item with the occupant of a vehicle located on the street.[6]

Before addressing the merits of her First Amendment challenge, the City argues that Petrello lacks standing to bring this claim.

A. Standing to Challenge the Ordinance

"Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" Susan B. Anthony List v. Driehaus, 134 S. Ct. 2334, 2341 (2014) (quoting U.S. Const., Art. III, § 2). To establish Article III standing, a plaintiff must show:

> (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180–81 (2000).

The City asserts that Petrello lacks standing to challenge the Ordinance because she has not suffered an injury in fact. "[A]llegations of possible future injury are not sufficient" to

---

[6] For simplicity, the court refers to the conduct prohibited by the Ordinance—distributing any item to, receiving any item from, or exchanging any item with the occupant of a motor vehicle located in the road—collectively as a "roadside exchange."

constitute injury in fact. Clapper v. Amnesty Int'l USA, 133 S.
Ct. 1138, 1147 (2013) (internal quotation marks omitted).
However, an "allegation of future injury may suffice if the
threatened injury is 'certainly impending,' or there is a
'substantial risk that the harm will occur.'" Susan B. Anthony
List, 134 S. Ct. at 2341 (quoting Clapper, 133 S. Ct. at 1150
n.5).

The City argues that Petrello has not suffered an injury
because she was never charged with violating the Ordinance and
has not panhandled in Manchester since the Ordinance was
enacted. While it is true that Petrello was never cited for
violating the Ordinance, "the threatened enforcement of a law"
may create an Article III injury. Id. at 2342. Thus, Petrello
may have standing to challenge the Ordinance although she was
not subject to "an actual arrest, prosecution, or other
enforcement action" under the Ordinance. Id.

In the First Amendment context, the First Circuit has
recognized that "two types of injuries may confer Article III
standing without necessitating that the challenger actually
undergo a criminal prosecution." Mangual v. Rotger-Sabat, 317
F.3d 45, 56 (1st Cir. 2003). The first is when "the plaintiff
has alleged an intention to engage in a course of conduct
arguably affected with a constitutional interest, but proscribed
by [the] statute, and there exists a credible threat of

prosecution." Id. at 56-57 (alteration in original) (quoting Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298). The second is when the plaintiff "is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences." Id. at 57 (quoting N.H. Right to Life Political Action Comm. v. Gardner, 99 F.3d 8, 13 (1st Cir. 1996)). "In both of these situations, the plaintiff's standing 'hinge[s] on the existence of a credible threat that the challenged law will be enforced.'" Reddy v. Foster, No. 14-cv-299-JL, 2016 WL 1305141, at *5 (D.N.H. Apr. 1, 2016) (alteration in original) (quoting N.H. Right to Life, 99 F.3d at 14), aff'd, 845 F.3d 493 (1st Cir. 2017); cf. N.H. Right to Life, 99 F.3d at 14 ("[A]s long as a credible threat of prosecution exists, a litigant has standing to mount a pre-enforcement challenge to the facial constitutionality of a statute on the basis that her First Amendment rights arguably are being trammelled.").

Here, Petrello has alleged an intention to engage in panhandling conduct that plainly implicates First Amendment interests. During her deposition, Petrello explained:

> I would [panhandle], because you know, I hate to say it, $1,500 is not a lot to live on. By the time I am done with my rent, groceries, my electric, my phone, my internet, I am practically broke by the end of the month. So yes, I would. Right now, I have got $20 in my bank account. . . .

> As of this moment right now, I have no plans on going
> out, but if that ordinance is removed and I am able to
> legally go out, then yes, I would go out.

Doc. no. 28-15 at 12 of 12.  In other words, Petrello has

alleged that she would panhandle again in Manchester if not for

the threat of being charged under the Ordinance.  And, because

the Ordinance prohibits the physical exchange of money between a

panhandler and a motorist on the road, Petrello's intended

conduct is proscribed by the Ordinance.  Although Petrello has

not panhandled in Manchester since the Ordinance was enacted,

she continued to panhandle intermittently in Hooksett and Derry

between December 2015 and July 2016.  Thus, the record

demonstrates that the Ordinance has chilled Petrello from

exercising her right to panhandle in Manchester.

Further, the court finds a credible threat that the

Ordinance will be enforced against Petrello in the future.

Prior to the MPD's decision to cease enforcing the Ordinance,

the MPD issued seven summonses to panhandlers for violating the

Ordinance between March and December 2016.  As such, the MPD has

a demonstrated record of enforcing the Ordinance against

panhandlers engaging in roadside exchanges.  Additionally,

before the Ordinance was enacted, Petrello twice received

summonses while engaging in the very conduct that the Ordinance

now bans.  Therefore, there is a "substantial risk" that

Petrello will be charged under the Ordinance if she panhandles

again in Manchester.  See Susan B. Anthony List, 134 S. Ct. at 2341.  Accordingly, Petrello has Article III standing to challenge the Ordinance.

B. Analysis of Petrello's First Amendment Claim

Having concluded that Petrello has standing, the court now turns to the merits of her First Amendment challenge.[7]  In deciding whether the Ordinance is constitutional, the court applies the same framework used above in analyzing Petrello's challenge to the MPD Policy.  That is, the court must determine the type of speech at issue, the location of the speaker, and the nature of the regulation, and then apply the appropriate level of judicial scrutiny.

1. The Ordinance Restricts Protected Speech

Like the MPD Policy, the Ordinance is a restriction on protected speech.  By prohibiting pedestrians from handing items to motorists, the Ordinance plainly bars individuals from engaging in First Amendment-protected activities such as leafletting.  See, e.g., McCullen, 134 S. Ct. at 2536; Schenck

_____

[7] Petrello asserts both "facial" and "as-applied" challenges to the Ordinance.  While a facial challenge seeks to strike down a law in its entirety, an as-applied challenge seeks relief only to the extent that the law has been applied in a plaintiff's particular case.  See Doe v. Reed, 561 U.S. 186, 194 (2010).  Because the court finds that the Ordinance, on its face, violates the First Amendment, the court does not address Petrello's as-applied challenge.

v. Pro-Choice Network of Western N.Y., 519 U.S. 357, 377 (1997); Grace, 461 U.S. at 176; Martin v. City of Struthers, 319 U.S. 141, 143 (1943).

Moreover, the physical exchange of money is an integral component and the ultimate purpose of panhandling, which is expressive activity protected by the First Amendment. See, e.g., Vill. of Schaumburg v. Citizens for a Better Env't, 444 U.S. 620, 632 (1980); cf. Citizens United v. FEC, 558 U.S. 310, 336 (2010) ("Laws enacted to control or suppress speech may operate at different points in the speech process."). Where the physical exchange of money is intertwined with solicitation speech, it is entitled to First Amendment protection. Cf. Speet v. Schuette, 726 F.3d 867, 876 (6th Cir. 2013) ("Schaumburg does not suggest that the physical exchange of money may be isolated; it is 'intertwined' with speech that the First Amendment protects.").

2. The Ordinance Restricts Speech in Public Forums

Like the MPD Policy, the Ordinance regulates speech in traditional public forums. The pedestrian involved in a roadside exchange is necessarily located on or adjacent to the street, such as a sidewalk or median. As discussed above, public streets and sidewalks constitute traditional public

forums, where the government's authority to regulate speech is "especially limited." Cutting, 802 F.3d at 83.

### 3. The Ordinance is Content Neutral

As the Ordinance regulates protected speech in a public forum, the court must next determine whether the Ordinance is content based or content neutral.  Petrello argues that the Ordinance is content based because it targets panhandling speech.  The City argues that, like the regulation in Cutting, the Ordinance is content neutral because it bans conduct regardless of the content of the speech.

In Cutting, the First Circuit struck down a regulation that made it unlawful to "stand, sit, stay, drive or park on a median strip . . . except that pedestrians may use median strips only in the course of crossing from one side of the street to the other."  See 802 F.3d at 82.  The City of Portland, Maine passed the regulation to address public safety concerns related to panhandling.  See id. at 81-82.  Portland had enforced the regulation against just five people, all panhandlers.  Id. at 82.  Although the regulation had been enforced exclusively against panhandlers, the court found that the regulation was content neutral because it "restrict[ed] speech only on the basis of where such speech [took] place."  Id. at 85.  The First Circuit explained that the regulation did "not take aim at—or

give special favor to—any type of messages conveyed in such a place because of what the message says." Id. (citing Reed, 135 S. Ct. at 2227). Thus, the First Circuit inquired whether the regulation, on its face, was narrowly tailored to serve a significant governmental interest.

Similar reasoning applies here. Although the MPD has only enforced the Ordinance against panhandlers, the Ordinance, on its face, does not regulate a particular type of speech or target a specific subject matter. The Ordinance applies generally to all exchanges involving the occupant of a motor vehicle when that vehicle is located on the road. For example, the Ordinance prohibits not only roadside panhandling and leafletting, but also exchanges involving a taxi driver, mail carrier, pizza delivery driver, or ice cream truck located on the road. In enforcing the Ordinance, the MPD does not need to consider the content of the speech being conveyed or, more literally, the type of item being exchanged. The Ordinance does not take aim at a particular type of message "because of what the message says." Id.

Moreover, the City enacted the Ordinance because "persons who distribute any item to, receive any item from or exchange any item with the occupant of a motor vehicle upon a roadway present a threat to the free and safe flow of motor vehicle traffic." 70.32(A). Members of the Board of Mayor and Aldermen

53

indicated that safety concerns related to roadside conduct like panhandling were the genesis for proposing the Ordinance, and the Ordinance's stated purpose is to "promote the health, safety, and welfare of the citizens traveling by vehicle in the City." Id. Thus, the record reveals that the City enacted the Ordinance for public safety reasons, specifically, to promote the free flow of motor vehicle traffic. For these reasons, the court finds that the Ordinance is a content-neutral restriction on expressive activity.[8] Cf. Watkins v. City of Arlington, 123 F. Supp. 3d 856, 866-67 (N.D. Tex. 2015) (ordinance prohibiting pedestrians in the road from soliciting or distributing items to occupants of vehicles stopped at traffic lights was content neutral); Traditionalist Am. Knights of the Ku Klux Klan v. City of Desloge, No. 4:13-CV-810 NAB, 2016 WL 705128, at *4 (E.D. Mo. Feb. 23, 2016) (ordinance prohibiting exchanges between pedestrians in the roadway and occupants of vehicles on the roadway was content neutral because it applied to the exchange of any item "without regard for communicative content").

---

[8] Whether the Ordinance is viewed as a restriction on conduct that incidentally burdens speech, see United States v. O'Brien, 391 U.S. 367, 376-77 (1968), or a time, place, and manner restriction, the court applies intermediate scrutiny to this content-neutral restriction. See Cutting, 802 F.3d at 83 n.4, 86-87 (applying intermediate scrutiny to a regulation "styled as a restriction only on conduct" that implicated the First Amendment).

4. <u>The Ordinance is Not Narrowly Tailored</u>

Like her challenge to the MPD Policy, Petrello's First Amendment challenge to the Ordinance hinges on whether the Ordinance is "narrowly tailored to serve a significant governmental interest." Rideout, 838 F.3d at 72 (quoting Ward, 491 U.S. at 791). As with the MPD Policy, the government has a significant and legitimate interest in protecting public safety and promoting the free flow of traffic on streets. See, e.g., McCullen, 134 S. Ct. at 2535; Cutting, 802 F.3d at 86. The Ordinance, which restricts interactions between pedestrians and vehicles on the road, is intended to serve those interests.

To be narrowly tailored, however, the Ordinance must not burden substantially more speech than is necessary to further those interests. A "content-neutral restriction on speech in a traditional public forum is facially unconstitutional if it does not survive the narrow tailoring inquiry, even though that ordinance might seem to have a number of legitimate applications." Cutting, 802 F.3d 79, 86-87 (citing McCullen, 134 S. Ct. 2518). "Thus, the seemingly tailored aspects of an untailored restriction on speech in a traditional public forum do not automatically save such a restriction from facial challenge." Id. (citing McCullen, 134 S. Ct. at 2534).

The Ordinance fails the narrow tailoring inquiry for four main reasons: (1) the Ordinance bans roadside exchanges that do

55

not obstruct traffic or pose safety risks; (2) the Ordinance is geographically overinclusive because it applies citywide; (3) the Ordinance is underinclusive because it penalizes only pedestrians, not motorists; and (4) the City has less speech-restrictive means available to address its concerns.

First, the Ordinance, on its face, bans all roadside exchanges in Manchester, regardless of whether those interactions obstruct traffic or otherwise create public safety issues. For example, the Ordinance prohibits a panhandler on the sidewalk from accepting money from a motorist at a red light, even though the interaction does not obstruct traffic or endanger the public. Likewise, a leafletter standing on the sidewalk violates the Ordinance when she hands a flyer to a motorist stopped in the street, even though the brief exchange does not create a traffic safety problem. Importantly, the Ordinance burdens the protected speech of pedestrians who are not standing in the road and thus not physically obstructing traffic. Courts have upheld regulations prohibiting pedestrians from standing in the street to solicit donations or distribute items where those regulations explicitly allowed pedestrians to stand on the sidewalk and engage in such activity. See, e.g., Watkins, 123 F. Supp. 3d at 868-69; Traditionalist Am. Knights of the Ku Klux Klan v. City of Desloge, 775 F.3d 969, 976-79 (8th Cir. 2014). The Ordinance, however, penalizes pedestrians

who are safely standing on the sidewalk.  Cf. Reynolds v. Middleton, 779 F.3d 222, 231 (4th Cir. 2015) (ordinance prohibiting "all roadside leafletting and solicitation, even where those activities would not be dangerous," failed narrow tailoring) (emphasis in original).  As such, the Ordinance bans roadside exchanges irrespective of whether that ban advances the City's interests.

Similarly, the City has failed to demonstrate citywide issues related to roadside exchanges justifying the Ordinance's wholesale, citywide ban on them.  The Ordinance, like the regulation at issue in Cutting, is geographically overinclusive.  In Cutting, the record established that only a handful of medians in Portland posed a public safety danger.  See 802 F.3d at 89.  Portland, however, passed an ordinance prohibiting people from standing on all median strips in the city.  Id.  The First Circuit held that the regulation was geographically overinclusive, explaining that "[a]bsent evidence about whether the City's other median strips present the same or a similar danger, we have no basis for concluding that a substantial number of them do."  Id.  Likewise, here, the City has not provided any evidence that a citywide ban on roadside exchanges is necessary to address public safety concerns.

Other courts have reached the same conclusion under similar circumstances.  In Reynolds, the Fourth Circuit explained that a

regulation prohibiting people on roads and medians from
distributing handbills, soliciting contributions, and selling
merchandise to vehicle occupants was not narrowly tailored to
address a limited safety problem.  See 779 F.3d at 231.

> The Amended Ordinance applies to all County roads,
> regardless of location or traffic volume, and includes
> all medians, even wide medians and those beside
> traffic lights and stop signs.  The Ordinance thus
> prohibits all roadside leafletting and solicitation,
> even where those activities would not be dangerous.
> The County's evidence, however, established, at most,
> a problem with roadway solicitation at busy
> intersections in the west end of the county.  Given
> the absence of evidence of a county-wide problem, the
> county-wide sweep of the Amended Ordinance
> burdens more speech than necessary, just as the
> statute in McCullen——a statewide statute aimed at a
> problem in one location——burdened more speech than
> necessary.

Id. (emphasis in original).  In Comite de Jornaleros de Redondo
Beach v. City of Redondo Beach, 657 F.3d 936, 940 (9th Cir.
2011), the Ninth Circuit struck down an anti-solicitation
regulation that prohibited "stand[ing] on a street or highway
and solicit[ing], or attempt[ing] to solicit, employment,
business, or contributions from an occupant of any motor
vehicle."  The court found that the regulation was
geographically overinclusive and failed narrow tailoring.  See
Redondo Beach, 657 F.3d at 948-50.

> The Ordinance applies citywide to all streets and
> sidewalks in the City, yet the City has introduced
> evidence of traffic problems only with respect to a
> small number of major streets and medians.  The City
> has offered no evidence to justify extending its

solicitation ban throughout the City in such a
sweeping manner.  Because the burden rests on the City
to submit evidence in support of its position, we
cannot simply assume that the City's other streets,
alleys, and sidewalks allegedly suffer from similar
solicitation-related traffic problems.

Id. at 949.

The same reasoning applies here.  The Ordinance prohibits
roadside exchanges on every public street in Manchester, from
quiet residential roads to busy intersections, despite the fact
that there is almost no evidence in the record that roadside
exchanges in the City actually obstruct traffic or endanger the
public.  In fact, there is evidence of only one accident in
Manchester that involved a roadside exchange.[9]

Unlike the defendants in Cutting, Reynolds, and Redondo
Beach, the City has not established that roadside exchanges pose
safety risks at even a handful of busy streets or intersections
in Manchester.  The City compiled no relevant data and conducted
no studies prior to passing the Ordinance.  Rather, the City
simply modeled the Ordinance after a nearly identical ordinance
passed by the City of Concord.  As such, the City adopted a
sweeping ban on expressive activity to address traffic flow and

---

[9] In its objection to Petrello's summary judgment motion,
the City attaches an affidavit of Captain Tessier noting that
between 2014 and 2016 there were 247 "pedestrian accidents" in
the City.  See doc. no. 39-2.  The City, however, has provided
no evidence connecting any of those accidents to roadside
exchanges.

safety problems that—on this record—do not exist, or, at best, are limited to only a few streets or intersections in Manchester.[10]  Due to the lack of evidence in the record of citywide problems related to roadside exchanges, the only reasonable conclusion is that the Ordinance burdens substantially more speech than is necessary to further the City's interests.  See Ward, 491 U.S. at 799 ("Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.").

Third, the Ordinance is underinclusive in that it penalizes only the pedestrian, not the motorist, involved in a roadside exchange.  Despite the MPD's understanding that the Ordinance was intended to be enforceable against motorists as well as pedestrians, the plain language of the Ordinance penalizes only pedestrians who pass items "with the occupant of any motor vehicle when the vehicle is located in the roadway."

_____

[10] For example, there is at least some evidence in the record of safety concerns at the Interstate 293 off-ramp near the Mall of New Hampshire.  See, e.g., doc. no. 28-1 at 11 of 24; doc. no. 28-5 at 8 of 18; doc. no. 28-29 at 12 of 19.  If the City had pinpointed specific locations in Manchester with a demonstrated record of safety problems related to roadside exchanges and limited its regulation accordingly, such a regulation would likely survive First Amendment scrutiny.  Cf. Cutting, 802 F.3d at 89-90.

70.32(C)(1).  The Ordinance does not address or penalize the motorist involved in a roadside exchange.

The City's stated purpose for passing the Ordinance was to promote public safety because "persons who distribute any item to, receive any item from or exchange any item with the occupant of a motor vehicle upon a roadway present a threat to the free and safe flow of motor vehicle traffic."  70.32(A).  But if a pedestrian on the sidewalk presents "a threat to the free and safe flow of motor vehicle traffic," id., then the motorist who physically stops in the road to pass or receive an item certainly presents that very same threat.  The Ordinance, however, does not penalize the motorist.  To promote public safety and ensure the free flow of traffic, such a regulation would address not just pedestrians, but motorists as well.  The Ordinance's failure to do so raises serious concerns with respect to the narrow tailoring analysis.  Cf. Reed, 135 S. Ct. at 2232 (holding that underinclusive sign regulation failed strict scrutiny); Williams-Yulee v. Fla. Bar, 135 S. Ct. 1656, 1670 (2015) ("Underinclusivity creates a First Amendment concern when the State regulates one aspect of a problem while declining to regulate a different aspect of the problem that affects its stated interest in a comparable way." (emphasis omitted)); Ridley v. Mass. Bay Transp. Auth., 390 F.3d 65, 87 (1st Cir. 2004) ("[W]here the government states that it rejects something

because of a certain characteristic, but other things possessing the same characteristic are accepted, this sort of underinclusiveness raises a suspicion that the stated neutral ground for action is meant to shield an impermissible motive.").

Fourth and finally, the City has less speech-restrictive means at its disposal to address legitimate public safety and traffic flow concerns. The City can enforce existing speech-neutral traffic laws to further its safety interests. For example, when a motorist stops in the road to give an item to a pedestrian and thereby impedes the free flow of traffic, the MPD could cite the motorist for obstructing vehicular traffic. See RSA 644:2, II(c); see also RSA 265:69 (prohibiting stopping, standing, or parking a vehicle on the roadway). When a pedestrian steps into the travelled portion of the road to accept a donation, thereby creating a public safety hazard, the MPD could charge the pedestrian for walking in the road. See RSA 265:39, I ("Where sidewalks are provided it shall be unlawful for any pedestrian to walk along and upon an adjacent roadway."); RSA 265:40, I ("No person shall stand on the travelled portion of a roadway for the purpose of soliciting a ride, employment, business or contributions from the occupant of any vehicle.").

Thus, the City has several options under existing New Hampshire law to address roadside exchanges that cause public

safety or traffic flow issues.  In fact, the record shows that the MPD was successfully enforcing these laws to prevent unsafe roadside exchanges that, for example, involved panhandlers walking between cars on the road.

For the reasons outlined above, the record reveals that the Ordinance burdens substantially more speech than is necessary to further the City's legitimate safety interests.  In passing the Ordinance, the City "sacrificed speech for efficiency, and, in doing so, failed to observe the close fit between ends and means that narrow tailoring demands." Cutting, 802 F.3d at 92 (internal quotation marks and alteration omitted).  Thus, the Ordinance, on its face, violates the First Amendment. Accordingly, the court **GRANTS** Petrello's motion for summary judgment on Count IV.

### 5. Relief

Petrello seeks declaratory and injunctive relief against the City.  For the same reasons stated with respect to the injunction under Count II, Petrello has demonstrated that a permanent injunction is appropriate under Count IV.  See eBay Inc., 547 U.S. at 391.  Accordingly, the court **GRANTS** Petrello's requests for declaratory relief and a permanent injunction against the enforcement of Manchester City Ordinance § 70.32.

## CONCLUSION

For the foregoing reasons, Petrello's motion for summary judgment (doc. no. 27) is **GRANTED** as to Counts II and IV and **DENIED** as to Counts I and III. The City's motion for summary judgment (doc. no. 30) is **GRANTED** as to Counts I and III and **DENIED** as to Counts II and IV. Count V is dismissed.

**IT IS FURTHER ORDERED THAT:**

(1)  The City of Manchester's policy of enforcing RSA 644:2, II(c) against passive panhandlers who do not step into the road or otherwise physically obstruct traffic, is hereby **DECLARED** to be unconstitutional in violation of the First Amendment of the United States Constitution;

(2)  The City of Manchester is hereby **PERMANENTLY ENJOINED** from enforcing RSA 644:2, II(c) against passive panhandlers, including Petrello, who do not step into the road or otherwise physically obstruct traffic;

(3)  Manchester City Ordinance § 70.32, entitled "Passing of Items to or from the Occupant of a Motor Vehicle," is hereby **DECLARED** to be unconstitutional on its face in violation of the First Amendment of the United States Constitution;

(4)  The City of Manchester is hereby **PERMANENTLY ENJOINED** from enforcing Manchester City Ordinance § 70.32; and

(5)  Trial will be held as scheduled on the issue of Petrello's compensatory damages with respect to Count II.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

September 7, 2017

cc: Elliott Berry, Esq.
    Gilles R. Bissonnette, Esq.
    Robert J. Meagher, Esq.
    Michael B. O'Shaughnessy, Esq.
    James G. Walker, Esq.